177 N.J. Super. 337 (1981)
426 A.2d 1021
IN RE APPLICATION OF RUSSELL MAHLER ET AL., FOR A WRIT OF HABEAS CORPUS. IN RE PETITION OF HUDSON OIL REFINING CORPORATION. IN RE APPLICATION OF EDGEWATER TERMINALS, INC. IN RE APPLICATION OF RUSSELL W. MAHLER.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1980.
Decided January 29, 1981.
*340 Before Judges ALLCORN, KOLE and PRESSLER.
Donald Horowitz argued the cause for appellants Russell W. Mahler and Edgewater Terminals, Inc. (Cummins, Dunn, Horowitz & Pashman, attorneys).
Charles F. Mandell argued the cause for appellant Hudson Oil Refining Corporation.
Robert J. Kleeblatt argued the cause for appellants Donald Wilson and James Carruthers.
Paul M. Cecere argued the cause for appellants Frank Reilly and Robert Vancio.
Eugene Callahan argued the cause for appellant Kenneth Mansfield (Bresin & Callahan, attorneys).
John A. Covino, Deputy Attorney General, argued the cause for respondent State of New Jersey (John J. Degnan, Attorney General, attorney).
*341 Ray A. Farrington, Assistant Prosecutor, argued the cause for respondent County of Bergen (Roger W. Breslin, Jr., Prosecutor of Bergen County, attorney).
K. Douglas Daniel, Deputy Attorney General, argued the cause for respondent Commonwealth of Pennsylvania (James J. West, Deputy Attorney General, attorney).
The opinion of the court was delivered by PRESSLER, J.A.D.
These consolidated appeals arise out of efforts by the State of Pennsylvania to prosecute a New Jersey corporation, Hudson Oil Refining Corporation (Hudson Oil), and a group of its officers and employees, also residents of New Jersey, who are alleged to have engaged in an illegal scheme involving the massive dumping of hazardous industrial wastes into the Susquehanna River. The cases raise important questions of interstate relations where one state is called upon to issue and execute search and extradition warrants in aid of a criminal prosecution by a sister state.
Explication of the issues here involved requires some brief procedural and chronological exposition. The assistance of the State of New Jersey was first sought by Pennsylvania during its investigation of the serious contamination affecting a 35-mile stretch of the Susquehanna River. That investigation led it to believe that Hudson Oil, a New Jersey hazardous industrial waste carrier, had caused or contributed to the contamination by having transported the wastes by tank carrier to the property of a service station in Pittston, Pennsylvania. The service station is located on property on which there is an abandoned mine shaft, and it is Pennsylvania's factual thesis that the wastes were then poured by Hudson Oil Employees from the tank carriers into the mine shaft by way of a bore hole and from thence found their way into the river.[1] The effect of this *342 dumping, Pennsylvania contends, was to contaminate the potable water supply of the City of Denville, to create a risk of lethal gas explosions within the mine shaft, to require the closing of the Susquehanna River to recreational activity and to threaten the aquatic life of the river.
The facts relied on by Pennsylvania to establish probable cause as to Hudson Oil's participation in this illegal dumping scheme, including the results of official surveillance conducted at the service station site after receipt of an anonymous tip implicating Hudson Oil, were set forth in the affidavit of one Fred Karl, Regional Solid Waste Manager for the Pennsylvania Department of Environmental Resources. Based on Karl's affidavit, Pennsylvania officials requested the New Jersey Attorney General to apply for a search warrant authorizing the search of Hudson Oil's business premises in Edgewater, Bergen County, New Jersey. That request was complied with and, on October 2, 1979, on application of a New Jersey Deputy Attorney General supported by the Karl affidavit, a search warrant was issued by the Law Division of the Superior Court of New Jersey sitting in Mercer County. The warrant authorized the search of the Edgewater premises for and the seizure therefrom of generally described business records and documents as well as samples of substances stored in oil storage tanks on the premises. The warrant was issued, moreover, upon the specific authorization of R. 3:5-2, which expressly permits issuance of a search warrant to search for and seize property constituting evidence of or tending to show a violation "of the penal laws of this state or any other state."
The warrant was executed on the following day by two officers of the New Jersey Division of Criminal Justice who were accompanied by various Pennsylvania officials, including Karl, who had specific knowledge about the case. The documents *343 seized were inventoried and physical possession thereof ultimately transferred by the New Jersey officers to the custody of Pennsylvania officials. It appears from the record that the search was conducted in a relatively businesslike, professional and amicable manner in the presence of counsel for Hudson Oil and its president, Russell Mahler. Various objections made during the search to seizure of specific items on the ground that they were not the property of Hudson Oil or Mahler apparently were attempted to be acceded to by the executing New Jersey officers. More specifically, Mahler apparently claimed that the oil tanks themselves and one ledger book were not the property of Hudson Oil but rather of Edgewater Corporation, of which he was also president. The executing officers also agreed not to search for or seize correspondence to and from Hudson Oil's and Mahler's attorneys.
Some weeks following the search, a Pennsylvania multi-county investigating grand jury returned a presentment against Hudson Oil and Mahler as well as those of its employees who are also appellants here, namely, Kenneth Mansfield, its truck dispatcher, and four drivers, Robert Vancio, Frank Reilly, Donald Wilson and James H. Carruthers. The presentment was not, however, made public until February 5, 1980 because of various applications made by these appellants in the courts of Pennsylvania challenging the grand jury proceedings.
In the meantime, Hudson Oil, by petition filed with the Superior Court, Bergen County, sought an order pursuant to R. 3:5-7(a) suppressing the evidence seized in the October search and returning its property to it. It was Hudson Oil's claim that the search was illegal because of alleged vitiating defects in the warrant and supporting affidavit.[2] That petition was subsequently *344 joined in by motion by Mahler and Edgewater Corporation, both claiming that property of theirs had been seized. Edgewater, it should be noted, was not named in the Pennsylvania presentment, and it has been represented throughout that not only is there no proceeding against it in Pennsylvania but also that none is contemplated. It is further stipulated that no proceedings are pending or contemplated against any other of these appellants in New Jersey.
The hearings on the suppression applications, which were opposed by the State of Pennsylvania and the State of New Jersey, were conducted following the publication of the Pennsylvania presentment. The petition of Hudson Oil and the motions of Mahler and Edgewater Corporation were denied by the trial judge without his having considered the merits thereof. It was, rather, the trial judge's essential view that he was without jurisdiction to suppress evidence intended for use in a proceeding in another State. Mahler, Hudson Oil and Edgewater Corporation appeal from the order denying the suppression relief. That order, since it represented a final disposition of the entire matter pending before the court, clearly constituted an appealable final judgment. R. 2:2-3(a)(1).
In the interim, Pennsylvania had initiated extradition proceedings against all appellants except Edgewater. Those proceedings culminated in the issuance of arrest warrants and amended arrest warrants by the Governor of the State of New Jersey against the six individual appellants, who challenged the warrants by way of individual habeas corpus petitions on the variety of constitutional, procedural and technical grounds discussed hereafter. Following a consolidated hearing of the habeas corpus petitions, the trial judge concluded that there was no vitiating defect in the extradition proceedings, declined issuance of the habeas corpus writs and directed appellants' extradition *345 to Pennsylvania. All six individual defendants appeal from these orders, and these appeals were consolidated by us with the pending appeals from the order denying suppression relief.
We address first the appeals by Hudson Oil, Mahler and Edgewater from the order denying suppression relief. For the reasons hereafter set forth, we conclude that the trial judge properly declined to deal with the appellants' applications on their merits.
As we have noted, these appellants sought an order of the New Jersey Superior Court pursuant to R. 3:5-7(a) prohibiting the evidential use in the pending Pennsylvania criminal actions of books and records seized in New Jersey pursuant to a search warrant issued in New Jersey and turned over to the custody of Pennsylvania law enforcement authorities. In our view, appellants' reliance on that rule in seeking their suppression relief from a New Jersey court rests upon a serious misconception of its remedial scope. Construction of the rule in terms of its historical and constitutional context mandates the conclusion that it was not intended and could not validly have been intended to extend its suppression remedy to a criminal proceeding pending in a court of another state even where the evidence in question is obtained by reason of a warrant issued by judicial authority of this state.
R. 3:5-7(a) provides in pertinent part that
On notice to the prosecutor of the county in which the matter is pending or threatened, [and] to the applicant for the warrant, if the search was with a warrant ... a person claiming to be aggrieved by an unlawful search and seizure and having reasonable grounds to believe that the evidence obtained may be used against him in a penal proceeding may apply only to the Superior Court in the county in which the evidence was obtained to suppress the evidence and for the return of the property seized....
This rule was first adopted by the New Jersey Supreme Court in December 1962[3] to implement the evidential mandate of Mapp *346 v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), reh. den. 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961), in respect of criminal proceedings prosecuted in this jurisdiction. Mapp, overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), extended to state court criminal proceedings the exclusionary rule which had been applicable to federal court criminal proceedings since the decision in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).
The exclusionary rule, which bars the admissibility of evidence obtained in violation of the constitutional guarantee of the Fourth Amendment, was not, however, intended to address, define, prescribe or limit the full panoply of remedies available to a person who asserts violation of his right to be secure from an unreasonable search and seizure. See, e.g., Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). It is simply, despite its constitutional underpinnings, a rule of evidence designed to vindicate the constitutional guarantee in the single respect of depriving the state of the opportunity to use evidence obtained as the result of an illegal search against the victim of that search. The concept of "use of evidence," moreover, clearly has no significance or vitality apart from the proceeding in which the evidence is to be used. While tangible evidence obviously has an independent objective existence, its function as evidence is, tautologically, entirely dependent upon the existence of a proceeding in which it is to be of aid. Thus, the exclusionary rule is both a conceptual and a practical irrelevancy, absent a proceeding in respect of which the use of the illegally seized evidence is contemplated. See, e.g., the concurring opinion of Justice Harlan in Bivens, supra, 403 U.S. at 410, 91 S.Ct. at 2011, *347 specifically referring to the exclusionary rule as "simply irrelevant" absent an ensuing prosecution. The exclusionary rule, therefore, does not become operative or invocable until there is actually or within contemplation a proceeding in which the state proposes to introduce the evidence which is alleged to have been illegally seized.
It is because the exclusionary rule is merely ancillary and adjunctive to a proceeding that R. 3:5-7(a), essentially a procedural rule, defines an aggrieved person, i.e., a person having standing to seek the suppression remedy, not only as the victim of the unlawful search but also as a victim who has "reasonable grounds to believe that the evidence obtained may be used against him in a penal proceeding."[4] Relief under the rule is accordingly denied in this jurisdiction on the ground of lack of standing and without adjudication of the merits of the suppression issue where there is neither a pending penal prosecution nor a threatened one. See State v. Casale, 106 N.J. Super. 157 (App.Div. 1969). This result is, moreover, consistent with the views on standing expressed by the United States Supreme Court. See Rakas v. Illinois, 439 U.S. 128, 132 n. 2, 99 S.Ct. 421, 424, n. 2, 58 L.Ed.2d 387 (1978), reh. den. 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979) in which the court noted that
Thus, a person whose Fourth Amendment rights were violated by a search or seizure, but who is not a defendant in a criminal action in which the illegally seized evidence is sought to be introduced, would not have standing to invoke the exclusionary rule to prevent use of that evidence in that action.
See, also, United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), holding that "Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search."
*348 Where a suppression motion is made in the absence of a threatened or pending action, it may be more accurate to articulate the basis of the denial of relief not on a lack of standing thesis but rather on the theory that there is no justiciable matter before the court since the impact of a suppression order goes solely to the proceeding in which the evidence is to be used, even though the object of the suppression order is the evidence itself. But whether the expressed basis for dismissal of the motion is lack of standing or lack of justiciability, we are satisfied that the same result, namely, dismissal of the motion, must obtain when there is no threatened or pending prosecution in the jurisdiction in which the motion is made, even if there is such a prosecution pending or threatened elsewhere.
As we have noted, R. 3:5-7 is a procedural rule. We regard it as axiomatic that such a rule promulgated by a sovereign jurisdiction to govern the conduct of judicial proceedings pending therein has no viability at all in respect of proceedings pending in another sovereign jurisdiction. Clearly, an order by a court of one state purporting directly to affect the conduct of a trial in another state would constitute an act of extraterritoriality wholly antithetical to the principles and practices of a federalist system in which each state is, judicially at least, a coequal, independent and autonomous agency free from interference by each other. What these appellants have apparently asked the trial court to do is to enter an order whose sole function would be to declare inadmissible at a criminal trial to be conducted in another state evidence which is in the custody of that state's governmental authority. This it patently could not have done.
Neither appellants' nor our own research has produced any reported decision dealing with one state's attempt to suppress, on Fourth Amendment grounds, evidence obtained by its officers pursuant to its judicial process but intended for use in a criminal prosecution in another state. We are guided, however, on a fortiori principles, by the refusal of the federal courts to so attempt to interfere with the conduct of state court criminal *349 trials despite the federal judiciary's modicum of superseding and supervisory powers over state courts, at least in respect of federal constitutional questions. Thus the United States Supreme Court has held to the view, both pre- and post-Mapp, that except in egregious circumstances, the federal district court may not enjoin either state or federal officers from introducing in state court criminal proceedings evidence allegedly obtained by them in violation of the Fourth Amendment. Stefanelli v. Minard, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951), involving evidence obtained by state officers, holds that
... [T]he federal courts should refuse to intervene in State criminal proceedings to suppress the use of evidence even when claimed to have been secured by unlawful search and seizure. The maxim that equity will not enjoin a criminal prosecution summarizes centuries of weighty experience in Anglo-American law. It is impressively reinforced when not merely the relations between coordinate courts but between coordinate political authorities are in issue.
And in Wilson v. Schnettler, 365 U.S. 381, 385, 81 S.Ct. 632, 635, 5 L.Ed.2d 620, reh. den. 365 U.S. 890, 81 S.Ct., 1025, 6 L.Ed.2d 200 (1961), involving the proposed use in a state court prosecution of evidence alleged to have been unlawfully obtained by a federal officer, the court, in affirming the denial of injunctive relief by the federal district court, observed that
There is still another cardinal reason why it was proper for the District Court to dismiss the complaint. We live in the jurisdiction of two sovereignties. Each has its own system of courts to interpret and enforce its laws, although in common territory. These courts could not perform their respective functions without embarrassing conflicts unless rules were adopted to avoid them. Such rules have been adopted. One of them is that an accused "should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial." Ponzi v. Fessenden, 258 U.S. 254, 260, 42 S.Ct. 309, 310, 66 L.Ed. 607, 611, 22 A.L.R. 879. Another is that federal courts should not exercise their discretionary power "to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent.... Douglas v. Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).
See, also, Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963). Cf. Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956), in which federal injunctive relief was authorized against a federal agent's participation in a state *350 criminal prosecution where such participation would have violated a specific federal court order.
We are, therefore, persuaded that in those circumstances in which a federal district court would be constrained by reasons of the demands of federalism to refrain from interference with state court criminal proceedings despite its coordinate territorial jurisdiction, the demands of federalism absolutely prohibit such interference by one state court in criminal proceedings pending in the court of another state.
Nor is there any need for the courts of this jurisdiction to act in order to vindicate the Fourth Amendment rights of these appellants. The exclusionary rule of Mapp is as binding upon the courts of Pennsylvania as it is upon the courts of New Jersey and, consequently, there is no reason to doubt that appellants will be afforded an appropriate opportunity to challenge the validity of the search and seizure in Pennsylvania on Fourth Amendment grounds. We appreciate, as appellants urge, that there may be variation between New Jersey and Pennsylvania in the working details and mechanics of their respective rules relating to search, seizure and suppression. Indeed, the inevitability of such variation among the states and as between the states and the federal courts was recognized by the United States Supreme Court, which expressly sanctioned such variations provided they do not either constitute or permit deviation from the fundamental criteria of the Fourth Amendment. Thus, in Ker v. California, 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963), the court explained that
The states are not ... precluded from developing workable rules governing arrests, searches and seizures to meet "the practical demands of effective criminal investigation and law enforcement" in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain.
We do not presume to suggest to Pennsylvania whether in its application of the exclusionary rule it should follow its own or New Jersey's procedural rules governing the issuance of search warrants since, in any event, we are confident that the fundamental *351 criteria of the Fourth Amendment will be observed. We do note, however, that there is nothing novel in the interjurisdictional situation in which a forum jurisdiction is required to apply the exclusionary rule in respect of evidence obtained by law enforcement officers of another jurisdiction purporting to act in compliance with the rules of that jurisdiction and pursuant to a warrant therein issued. Where the question arises in the context of federal prosecutions, the developing rule appears to be that if the challenged warrant was issued as a state warrant under state law, the evidence obtained upon its execution will be admissible if the warrant complied with state law even if not with all of the requirements of federal law as expressed by Fed.R.Crim.P. 41, provided only that the noncomplied-with federal rule prescriptions do not go to essential constitutional requirements or the essential integrity of the federal courts. See, e.g., United States v. Sellers, 483 F.2d 37 (5 Cir.1973), cert. den. 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974), specifically holding that
If the warrant was issued under authority of Rule 41 as a federal warrant clearly it must comply with the requirements of the rule. If however, the warrant was issued under authority of state law then every requirement of Rule 41 is not a sine qua non to federal court use of the fruits of a search predicated on the warrant, even though federal officials participated in its procuration or execution. The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant satisfies constitutional requirements and does not contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers. [at 43]
See, also, cases collected in Annotation, "Evidence  State Search Warrant," 25 A.L.R.Fed. 247 (1975).
Nor are state courts any less adept at applying the exclusionary rule in respect of evidence obtained as the result of a warrant issued and executed in another state. See, e.g. McClellan v. State, 359 S.2d 869 (Fla.D.Ct.App. 1978), cert. den. 364 S.2d 892 (Fla.Sup.Ct. 1978). There evidence was proferred in a Florida murder prosecution which had been obtained pursuant to a warrant issued in Alabama in accordance with Alabama law which permits oral testimony in supplementation of the supporting *352 affidavit. Defendant objected to the admission of the evidence in the Florida proceeding on the ground that Florida law does not so permit. It was the holding of the Florida court that
... evidence procured in a sister state pursuant to a search valid under the laws of that state is admissible in the trial of a criminal case in Florida notwithstanding that the warrant validly issued and executed in the sister state would not have been or was not valid under the laws of Florida; provided the warrant and its execution in the sister state does not offend U.S. Constitutional standards. [at 873].
We have no doubt, therefore, of the exclusiveness of Pennsylvania's jurisdiction to determine the applicability of the exclusionary rule in its proceedings, to determine if the search and seizure here challenged comported with federal constitutional standards, and to construe and apply New Jersey law should it conclude that it must do so.
Our final observation is responsive to appellants' claim that there is an anomaly in New Jersey's refusal to reach the merits of its challenge to the search since the warrant was issued under New Jersey judicial authority and executed in New Jersey by New Jersey officers. Their contention is that whatever judicial action is taken by a New Jersey court must be subject to review by New Jersey judicial authority. We are constrained to disagree with this thesis. A motion to suppress the fruits of a warranted search does not constitute a direct appeal from the exercise of the magisterial authority by which the warrant was issued. Rather, the motion is, in effect, a collateral attack upon that exercise of judicial authority. So long as there is available an appropriate forum for making that collateral attack, we perceive no fundamental requirement that it be permitted to be made in this state. And, moreover, as we have held, the appropriate forum for such a collateral attack is the forum in which the penal proceedings are pending. In short, appellants may assert in this jurisdiction whatever other remedies they may have resultant from a violation of their Fourth Amendment rights or of their rights under the State Constitution. See N.J.Const., Art. I, par. 7 (1948). The remedy which they may *353 not seek here, because no penal proceeding is pending here, is application of the exclusionary rule.
Turning now to the plethora of challenges made by appellants to the extradition orders, we are satisfied that none has any substantial merit.
New Jersey adopted the Uniform Criminal Extradition Law by L. 1936, c. 42, N.J.S.A. 2A:160-6 to 2A:160-35, inclusive. The arrest warrants against the four driver appellants, Vancio, Reilly, Carruthers and Wilson, were issued pursuant to N.J.S.A. 2A:160-11 (§ 3 of the Uniform Law), the so-called fugitive provision of the law, their unlawful conduct being alleged by Pennsylvania to have been committed in that state. The amended arrest warrants against Mahler and Mansfield were issued pursuant to N.J.S.A. 2A:160-14 (§ 6 of the Uniform Law), the nonfugitive provision of the statute. The allegations of Pennsylvania against Mahler and Mansfield were basically that, while present in New Jersey, they instructed the drivers to violate the Pennsylvania law.
Appellants Mahler and Mansfield argue first that, in contra-distinction to the mandatory gubernatorial obligation when requisition for a fugitive is made by a demanding state, the nonfugitive provision of the statute accords the governor of the asylum state the discretion not to surrender a nonfugitive to the demanding state. They thus contend that they are entitled to a hearing before the Governor of New Jersey on the extradition demand in order that he may reasonably exercise that discretion. We agree that the surrender of a nonfugitive, unlike surrender of a fugitive, is within the discretion of the Governor, and § 6 of the Uniform Law has uniformly been so construed. See, e.g., Dutil v. Rice, 34 Conn.Sup. 78, 376 A.2d 1119 (Super. Ct. 1977); Conrad v. McClearn, 166 Colo. 568, 445 P.2d 222 (Sup.Ct. 1968); People ex rel. Bernheim on Behalf of Fuller v. Warden of House of Detention for Men, 408 N.Y.S.2d 285, 95 Misc.2d 577 (Sup.Ct. 1978); People v. Hinton, 386 N.Y.S.2d 703, 40 N.Y.2d 345, 353 N.E.2d 617 (Ct.App. 1976); Cooper v. McDermott, *354 399 Pa. 160, 159 A.2d 486 (Sup.Ct. 1960). We do not agree, however, that the discretionary nature of the gubernatorial function mandates a hearing as a prerequisite to a valid exercise of discretion. Neither the New Jersey statute nor the Uniform Law which it follows so provides, nor has such a pre-arrest hearing requirement been imposed, insofar as we can determine, by any sister jurisdiction which has adopted the Uniform Law.
Nor do we perceive any prejudice to these appellants resultant from the refusal of the hearing which they requested. The record before us indicates that the initial arrest warrant was issued by the Governor of New Jersey on July 22, 1980. More than two months prior thereto, counsel to the Governor had advised appellants, or at least some of them, of the receipt of Pennsylvania's request for their rendition, of the apparent compliance of the papers with statutory requirements, and of appellants' opportunity to submit papers in opposition to the request. The record further shows that extensive briefs were filed by counsel on behalf of each of the appellants raising, we may presume, whatever arguments they regarded as relevant and available to support their opposition to extradition. Following the initial issuance of the warrants, appellants Mahler and Mansfield submitted further written argument to the Governor, on the apparent basis of which the warrants were then amended.
We further note that the Governor is precluded by N.J.S.A. 2A:160-28 (§ 20 of the Uniform Law) from inquiring into the guilt or innocence of the accused of the crime with which he is charged by the demanding state. That provision clearly applies both to fugitive and nonfugitive extradition. The hearing which appellants requested, therefore, could not have addressed that issue, and appellants do not suggest to what legitimate components of the discretionary decision they would have directed such a hearing opportunity. They do not, moreover, suggest that there was any improper motivation in the Pennsylvania proceeding or that any material facts were not fully disclosed by *355 or to them, or that their written presentations were in any way incomplete.
Thus, in the absence of an express constitutional or statutory hearing requirement, we are satisfied that whatever minimal due process rights appellants may have had in respect of the Governor's exercise of executive discretion were adequately protected by the invitation to them, which they accepted, to be "heard" in writing.
Appellants Mahler and Mansfield next challenge the order of the trial judge granting the State's motion to quash the subpoena appellants had served upon the Governor requiring him to testify at the habeas corpus hearing. We agree with the trial judge that the Governor cannot be compelled by process to appear at a habeas corpus hearing in order to explain and justify his discretionary executive decision to issue an arrest warrant in aid of extradition of nonfugitives. See N.J. Turnpike Auth. v. Sisselman, 106 N.J. Super. 358 (App.Div. 1969), certif. den. 54 N.J. 565 (1969). Cf. United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429, reh. den. 314 U.S. 707, 62 S.Ct. 52, 86 L.Ed. 565 (1941).
It is further contended by appellants Mahler, Mansfield, Reilly and Vancio that the arrest and amended arrest warrants were invalidly issued because of the failure of the demanding state, Pennsylvania, to show probable cause for the charges made against them. This contention runs counter, however, to the holding of Michigan v. Doran, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978), which makes clear that once the Governor has granted extradition on documents which on their face are in order, the subsequent judicial inquiry on a habeas corpus proceeding is limited to the questions of whether the papers charge a crime in the demanding state, whether the habeas corpus petitioner is the person named in the extradition request and whether he is within a category of extraditable persons. While Michigan v. Doran, supra, involved a fugitive extradition, we are persuaded that its limitations upon the *356 post-arrest judicial inquiry by the asylum state apply to a nonfugitive extradition as well. We also reject the contention of Mahler and Mansfield that Pennsylvania's charging documents fail to meet the technical requirements of N.J.S.A. 2A:160-11 and 14. As we read the documentation, it is clearly sufficient to charge them with the commission of an act in New Jersey intentionally resulting in a crime in Pennsylvania. We are satisfied as well, despite the contrary arguments of Mahler and Mansfield, that the New Jersey arrest warrants were patently adequate in meeting the technical requirements of N.J.S.A. 2A:160-15.
Appellants Mahler, Mansfield, Carruthers and Wilson further argue that the extradition proceedings should have been stayed pending a determination of the validity of the search and seizure since the fruits of the search, having been used evidentially by the Pennsylvania grand jury, tainted its presentments against them. We note, however, that the United States Supreme Court in United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), has expressly refused to extend the exclusionary rule to grand jury proceedings. We further note that the holding in State v. Sugar, 84 N.J. 1 (1980), upon which appellants rely, was based upon egregious circumstances not remotely present here and would not in any event be binding upon Pennsylvania.
Appellants Mahler, Mansfield, Reilly and Vancio also argue that the New Jersey Extradition Act is unconstitutional. Mahler and Mansfield so assert on the basis that the nonfugitive provision thereof contravenes Art. 1, § 10, cl. 3 of the United States Constitution for the reason that Congress has not given prior consent to a nonfugitive interstate extradition agreement. This assertion is simply incorrect. See 4 U.S.C.A. § 112(a), which clearly encompasses extradition generally and without limitations based on any categorization. We further regard as *357 specious the contention of Reilly and Vancio that the Extradition Act is unconstitutional in that it compels one to testify against himself.
Finally, the appellant drivers argue that the offenses with which they were charged by the State of Pennsylvania did not constitute crimes within the mandate of N.J.S.A. 2A:160-10, which prescribes as a prerequisite to extradition a charge of "treason, felony or other crime." Since the charges against these appellants were brought under Pennsylvania regulatory rather than criminal statutes we required further explication from Pennsylvania as to its definition of a crime and the penalties involved for violation of its environmental legislation alleged by it to have been violated by these appellants. Among the offenses with which these appellants were charged were violations of the Pennsylvania Clean Streams Law, more specifically, 35 P.S. § 691.301 and § 691.307 (discharge of industrial wastes into waters of the Commonwealth), and 25 Pa. Code § 97.72 (discharge of inadequately treated wastes into a mine). The Clean Streams Law penalty section, 35 P.S. § 691.602(b), imposes a maximum penalty for each wilful or negligent violation of any of the law's provisions of one-year imprisonment or a fine of not less than $2500, or both, and further constitutes such violations a misdemeanor of the third degree. By 18 Pa. C.S.A. § 106(b)(8) a misdemeanor of the third degree is classified as a crime in contradistinction to summary offenses, defined by 18 Pa. C.S.A. § 106(c). We are satisfied on the basis of the Pennsylvania statutory complex that the Clean Streams Law violations here charged constitute crimes in that state within the intendment of N.J.S.A. 2A:160-10. The fact that other regulatory violations charged against these appellants may not be crimes simply renders as surplusage the recitation of those charges in the extradition documents.
All of the orders here appealed from are affirmed.
NOTES
[1] We are advised that the three owners of the service station have already been convicted of numerous violations of the Pennsylvania Clean Streams Law and of other offenses relating to the participation in the alleged dumping scheme.
[2] The claims made by Hudson are that the warrant improperly issued because the applicant therefor was not himself the probable-cause affiant and because the description both of the premises to be searched and of the property to be searched for and seized was both unduly broad and unspecific. It also claims that the Karl affidavit was insufficient to establish probable cause of the commissions of a crime and the identity of the person or persons committing it.
[3] R. 3:5-7(a) derives from R.R. 3:2A-6(a), adopted on December 6, 1962, to be effective January 2, 1963, as part of the set of rules denominated R.R. 3:2A-1 to 3:2A-10, inclusive, encaptioned, generally, "Search Warrants" and directly responsive to the mandate of Mapp. See, e.g. State v. Contursi, 44 N.J. 422, 428, n. 2 (1965); State v. Green, 49 N.J. 244, 246 (1967). Prior to Mapp New Jersey did not follow the federal exclusionary rule and consequently no suppression procedure had been provided for.
[4] The rule expressly refers to pending or threatened proceedings only in terms of identifying the county prosecutor who must be noticed of the suppression application. It is obvious that the phrase "penal proceeding" used in the definition of aggrieved person is intended to include threatened as well as pending proceedings.