Louis B. Scheinman, J.
These are motions by defendants to suppress certain tangible evidence seized pursuant to search warrants and also a warrantless arrest, and to suppress certain confessions or admissions.
The indictment charges defendants with the crimes of murder in the second degree, kidnapping and robbery.
Although the cases have been severed for trial, these hearings were combined and held jointly, pursuant to stipulation.
This opinion will set forth the facts found by this court in making its determination (CPL 710.60, subd 4). Although different standards of proof are required on the several types of suppression sought (People v Pobliner (32 NY2d 356) clear and convincing evidence test on motion to suppress evidence other than a confession, and People v Huntley (15 NY2d 72) beyond a reasonable doubt test as to voluntariness of a confession, this court has found all facts mentioned beyond a reasonable doubt.
At about midnight of October 13, 1975, one Craig R. Mitton was reported missing by his wife. It was learned by the New York State Police that he had been employed by the Mid-Valley Petroleum Corporation of Newburgh, New York, as a route sales supervisor, whose duties included collecting money from gas stations operated by his employer and depositing same each afternoon at about 4:00 p.m. in a night depository at a certain local branch bank.
The police learned from company officials that on said date *1021 of October 13 he had made up the deposit, which included cash in four bags, and left for the nearby bank at a time which was between 4 o’clock, and 4:45 p.m. on that date. He was not seen or heard from thereafter, and the said deposit in excess of $25,600 had not been made.
On October 15, 1975, his body was found in Sullivan County, with clear evidence that he had been the victim of foul play, his body evidencing three bullet holes, two in the head and one in the back, and a blow to his head.
The vehicle used by the deceased, which belonged to his employer, was found abandoned in another location, with a change box.
The police learned from one Gloria Baker, who personally knew defendant Lucas, that at about 4:00 p.m. on October 13, she had seen defendant Lucas sitting in a Lincoln automobile with another unidentified person at the branch bank where the deceased was to have made the deposit. Gloria Baker also advised the police that defendant Lucas had cohabited for a time with one Madeline Mead, employed at the Middlehope Service Station, and that defendant Graham had also been employed at said service station. The police also learned from a Julia Tibby, that her sister, Sherryl Kilb had gone on a small vacation with defendant Lucas, another girl, Birdie, and another fellow, "Richie”.
The police also learned from company officials that defendant Graham had held the same position with Mid-Valley Petroleum Corporation as the deceased, but had been fired about two weeks earlier for taking home a deposit of approximately $30,000 without depositing same in the night depository at the same bank branch.
Julia Tibby had also told the police that Graham possessed a handgun. Further inquiry disclosed that he had no permit for same.
The police were also advised that defendant Graham wore a gun holster on his person.
The police also learned that the defendants were friends, and that they and the girls Sherryl Kilb and Roberta Graham had left the area in the evening or night of October 13.
One Georgia Shorey had also advised the police that Lucas, Sherryl Kilb, Graham and one Roberta Holmes were together in the New York City area, and that Georgia Shorey had a money-gram waiting for her at the Newburgh Western Union *1022 office, subsequently learned to be in the sum of $100, from one of the defendants in Florida.
Gloria Baker had also advised the police that about a week earlier, Lucas had called her to obtain the keys to the safe at the Middlehope Service Station, as he was in need of money and that no one would be hurt. She refused, and subsequently she received a telephone call from Lucas telling her that if she told anyone of their conversation he would shoot her. On that same evening the said gas station was burglarized and money and cigarettes stolen.
Subsequently, the police learned that Georgia Shorey received a telephone call from Lucas advising her not to reveal the whereabouts of the two defendants and the girls to anyone.
The police launched a search for defendants and checked airports in the New York metropolitan area and located the 1974 Lincoln at the Gateway Motel in Newark, New Jersey, near Newark Airport, during the early morning hours of October 17.
The Motor Vehicle Department confirmed that the car belonged to Lucas. A bartender at the motel identified a photograph of Lucas, and advised the police that he had been tipped with a paper bag containing about $8 in change, there having been change missing from the change box found in the company car driven by the deceased victim.
The police also learned that defendant Lucas had an extensive arrest record with one or two convictions. The crimes mentioned on his record included crimes of violence and the use of firearms.
A check made with the Motor Vehicle Department revealed that the Lincoln autombile owned by Lucas was a 1974 model, and its license plates number, which matched the plates on the car.
Following the location of the automobile, the same was placed under discreet surveillance by the New York State Police, and that afternoon other New York officers arrived. Subsequently, at about 4:00 p.m. on the 17th, Investigators Chandler and Ovens, together with a member of the local prosecutor’s office, appeared before a Superior Court Judge of the State of New Jersey and gave testimony under oath before said Judge in their application for a search warrant of the automobile. A transcript of said proceedings was received in *1023 evidence, showing that there was preliminarily a discussion with the court, after which the court placed the oral application on the record, the court capsulizing or summarizing the facts giving rise to probable cause on the record.
An issue was raised at the hearing as to whether the officers were sworn during the recorded phase of the record, which contains most of the facts above mentioned, or, as Investigator Chandler testified, when the initial discussion with the court commenced off the record. Defense counsel were given the opportunity to confer with the New Jersey court, and to call the Judge as a witness to controvert the testimony of Investigator Chandler. Although one of the defendant’s attorneys conferred with said Judge, he was not called.
This court finds beyond a reasonable doubt that all of the foregoing facts were laid before the New Jersey court, under oath, which, in the transcript in evidence held "I am satisfied that there is probable cause to believe that a crime has been committed and that there is probable cause to believe that the automobile sought to be searched and seized has been sufficiently established as the connecting link between the commission of the homicide and evidence of the crime,” and signed the search warrant.
A search of the car was then conducted by a New Jersey police officer with two New York State police officers in attendance and assisting.
It should be noted, parenthetically, that the reason the application for the search warrant was made by sworn testimony rather than by affidavit is recited in the New Jersey transcript in evidence, i.e., that the application was made on a Friday, at about 4:00 p.m., and that there was, therefore, insufficient time to prepare papers for the Newark prosecutor’s office and the probable unavailability of a Judge on the weekend.
The search of the Lucas’ vehicle yielded miscellaneous papers belonging to defendants Graham and Lucas and a Debra Kilb, a rope, a rifle, shotgun shells, a hair from the trunk area, and other items of property.
All items of personal property found in the car, and the car itself, were inventoried and, with the approval of the New Jersey Court, removed to New York State Police headquaters in New York.
A check with the airlines in Newark revealed that a "Mr. *1024 and Mrs. Richard Lucas” and a "Mr. and Mrs. Richard Graham” had departed on a 9:05 p.m. flight from Newark to Fort Lauderdale, Florida, on October 14. The police also learned that defendants had a Doberman Pincer dog with them.
A number of New York State police officers flew to Fort Lauderdale on the night of October 17. The following day, October 18, the police learned from the Western Union office in Florida from which money-grams had been sent to the Newburgh, N. Y. area the address of a motel in Dania, Florida, which defendants had given to Western Union. It was further learned that Lucas and Graham had sent an additional money-gram each to the Newburgh, N. Y. area.
It was also learned that defendants had registered at this motel under their own names in two rooms, but had given false addresses, and had also rented a car and motorcycle, that they had a large amount of money with them in travelers checks.
On the 18th, the New York State police officers met with officers of the Broward County Sheriff’s department and a member of the Florida Division of Law Enforcement, filled them in on all of the foregoing facts, including those earlier mentioned herein in dealing with probable cause for the automobile search warrant obtained in New Jersey, and a surveillance was maintained of the two motel rooms occupied by defendants.
The Florida police requested a teletype message from New York, describing defendants as fugitives. The New York police made such request by telephone, and also for an arrest warrant to be obtained in New York. The teletype message directing the arrest was received in Florida before 8:00 p.m. on the 18th. However, it appears that although the officer in charge of the investigation in New York requested that an arrest warrant be obtained here, the same was not obtained until October 20. However, the officers believed that the warrant had been obtained and was in existence prior to the arrests.
Defendants and the two women with them returned to the motel rooms at 6:00 a.m. on the 19th. Believing them to be armed and with a vicious dog, the police waited until 8:00 a.m. when without warning or notice, the police officers simultaneously, with the use of a passkey to one room, and through an unlocked door to an adjoining room, entered both rooms with drawn guns and one officer with a towel wrapped around his *1025 arm as a precaution against the dog, and arrested the defendants, who, together with the two women, were taken to the Sheriff’s Department in Fort Lauderdale, where they arrived at 9:00 a.m. There was no dog in the room, it having been placed with a veterinarian a day or two earlier, nor any guns found.
Defendant Graham was given his full "Miranda” warnings four times, once in the motel room, upon arrival at the Sheriff’s Department, before making his confession, and at the beginning of his confession, which was tape recorded. On two occasions, at 9:00 a.m. and 11:00 a.m., he signed written acknowledgments of having received these warnings and, specifically waived counsel, as he also did orally at the commencement of his tape recorded confession.
A typewritten transcript of Graham’s confession was received in evidence at the hearing, (which Graham subsequently refused to sign) and this court listened, in camera, to the tape recording of the confession (by stipulation). This court is satisfied beyond a reasonable doubt that Graham knowingly, intelligently and voluntarily waived his right to remain silent and to counsel.
The confession, which took 45 minutes to tape, was completed orally at 11:45 (the same day as the arrest) and in brief substance sets forth the following:
Lucas, who was his friend and drinking companion, and familiar with handling of the moneys at Mid-Valley Petroleum, suggested the robbery of Craig Mitton to Graham who agreed to participate. On October 13, they waited for the victim at the branch bank, held him up, Lucas ordering Mitton into Lucas’ car, Graham following in Mitton’s station wagon. They drove to a lonely country area where they abandoned Mitton’s car, ordering Mitton into the trunk of the Lincoln. They then drove to another isolated area, Lucas and Graham discussing the fact that Mitton knew Graham as coemployees of Mid-Valley, Lucas insisting, therefore, that they had to "blow him away”. When the car was stopped, Graham opened the trunk, Mitton was ordered out, Graham hit him over the head knocking him down with a club, and while Mitton was on the ground, Lucas shot him in the head and back area several times until his gun jammed, and then left the body of the victim there, left the murder scene, picked up the two women, disposed of the handgun used in the killing in a stream in New Jersey, etc. He told of taking the *1026 money, about $26,000, including change from the change box, he and Lucas placing most of the money in safety deposit boxes in two banks in Newark, purchasing travelers checks, and leaving for Florida. He exonerated the two women from any implication in or knowledge of said crimes.
Lucas refused to make any statements to the police.
On October 21, both men were taken before a court in Florida, and waived extradition to New York, Lucas after conferring with counsel which he had requested.
It should be mentioned here that Graham testified in his own behalf at the hearing, and claimed that he had been beaten by an Officer Reidy of the New York State Police about 10:00 a.m. while in the Sheriffs office in Florida and his confession thus coerced. This court is convinced that said claim is a pure fabrication, as Investigator Reidy had little or nor contact with him subsequent to the arrest and prior to the confession, Reidy having remained at the motel after the arrests and removal of defendants assisting Florida Police in inventorying the property found there. Also, Graham claimed marks on his torso from the alleged beating having evidently forgotten when he testified that when processed at the New York State Police barracks upon his return he had been photographed, front and rear, with absolutely no evidence of same, nor had he complained of any mistreatment to any other police officer nor to the Florida court when he was brought before said court.
The hearings also covered an inculpatory statement made by Lucas on the airplane trip back to New York. It is clear, even from the testimony of Lucas at the hearing, that he was not mistreated in any way, and that his remarks to the police officer seated next to him on the airplane were voluntary, unsolicited, and after being warned before he spoke that his statement could be used against him. Nor was such statement the result of any interrogation. Lucas merely denied making the statement, and whether he did or did not would be for a trial jury to decide.
An issue developed regarding a cowboy type hat worn by Lucas. This hat had been returned to Lucas in Florida, and he wore it on the trip back to New York. However, after processing at the State Police barracks, he inadvertently left it there. The police, then realizing it had evidentiary value, kept it as evidence. Lucas also seeks its suppression.
Based upon the Graham confession and its mention of the *1027 hiding of the money proceeds in safety deposit boxes in Newark, the police obtained the names of the banks and the numbers of the accounts, and applied by written sworn applications to the same New Jersey court for search warrants on these two banks and respective safety deposit boxes, obtained the search warrants, and searched and seized the boxes and bank records pursuant thereto.
Returns on all search warrants were duly furnished to the New Jersey Court, and upon order of said court, all seized property was returned to New York State (including the car and its contents).
Lucas’s safety deposit box yielded $10,342. Graham’s safety deposit box yielded $10,893.
It should be noted here that defendants called Roberta Holmes and Sherryl Kilb as their witnesses. The women testified that they were taken also to the Sheriffs department in Florida, were given Miranda warnings and both made statements to the police. They were well treated, taken back to the motel, the police making the arrangements for their return to New York and transportation to their respective homes. Graham had given Roberta Holmes the keys to the safety deposit box which she kept in her purse, and she had no objection to the police taking the keys. These keys were of the safety deposit box rented by Graham. Lucas’ keys to the safety deposit box rented by him were amongst the property removed from his room.
An issue also developed at the hearing as to whether the two women were arrested in the motel rooms. This court finds from the evidence that they were, in that their movements were restrained, they were taken to the Sheriffs office and not advised they were free to leave until after they were interrogated and after Graham’s confession when the police were satisfied that they had no knowledge of the crimes.
This court further finds that due to the foregoing, and the police initially not expecting the women to be returned to the motel, that all the contents of the rooms occupied by the defendants were inventoried and removed to the Florida Sheriffs office for safekeeping, and, after certain belongings were returned to the women upon their release that day, all the rest of the property was turned over to the New York State Police for return to New York.
On October 20, while the 1974 Lincoln was still in New *1028 Jersey, the trunk interior was dusted for fingerprints, and fingerprints of the deceased, Craig Mitton, found.
Defendants seek suppression of all items of evidence seized in New Jersey, claiming absence of probable cause for the search warrants issued by the New Jersey Court, and suppression of all evidence obtained in Florida by reason of the claimed illegality of the arrests there, including suppression of the confession by Graham as a result of said arrest, and of the inculpatory statement made by Lucas. They also seek suppression of the fingerprints found in the trunk of the car, of Lucas’ hat, etc. Miscellaneous other grounds are suggested by defendants for the suppression of all the foregoing.
Defense counsel argued strenuously that, with respect to the New Jersey searches, the Florida warrantless arrest, search, seizure and confessions or admissions, that New Jersey and Florida laws, respectively, apply. They maintain that under the laws of such States, the evidence obtained in said States should be suppressed pursuant to applicable case and/or statutory law in said States, respectively.
This court is by no means convinced that New Jersey or Florida laws differ significantly in their application to the facts here from New York law. No expert testimony was offered with respect to the laws of such States, although citations of New Jersey and Florida cases and Florida statutes were made in their briefs.
Thus, a threshold question must be determined by this court, i.e., whether the laws of such States are to be applied with respect to the evidence sought to be suppressed obtained in such States, or whether our own laws govern with respect to the admissability of such evidence.
Counsel have cited no cases bearing upon this conflict of laws question, and, indeed, this court has not been able to unearth any New York case dealing with this conflict of laws problem in the criminal law area.
Turning to other jurisdictions faced with this question, there are cases persuasive, however, on this point. In Burge v State (443 SW2d 720 [Tex]) the defendant was convicted of burglary and attempted rape in Texas. He was a resident of the State of Oklahoma, and while he was in Texas custody, his wife, at his Oklahoma residence, permitted police officers to search their home in Oklahoma without a warrant. Contrary to Texas law, Oklahoma grants to each spouse a personal right to demand a search warrant for the search of the *1029 marital residence. Upon said search which was made without the consent of the defendant, incriminating evidence was found and admitted at the Texas trial.
The Texas court found the question to be evidentiary and procedural in nature, and thus governed by the law of the forum, and affirmed the conviction.
In People v Saiken (49 Ill 2d 504) the Supreme Court of Illinois, faced with the same problem, adopted a broader approach, applying the "significant relationship”, or "center of gravity”, conflict of laws rule. The defendant in said case was convicted in Illinois of conspiracy to obstruct justice by concealing the body of a murdered victim on his farm in the State of Indiana. The victim had been murdered in Illinois, her body transported to and buried on the defendant’s farm in Indiana.
As a result of certain information obtained by the police as to where the body was buried in Indiana, an Illinois police officer obtained a search warrant from a Judge in Indiana, searched at the farm and recovered the body of the victim. The affidavit upon which the search warrant was predicated was based upon hearsay information and conclusions of the police officer, clearly insufficient under Indiana law, although adequate under the law of the forum State, Illinois. The evidence was admitted at the Illinois trial.
The Illinois Supreme Court, citing Burge (supra) and other authorities, upheld the conviction.
The court pointed out that, traditionally, conflicting principles prescribed that issues of clearly procedural nature are governed by the laws of the forum, whereas substantive matters are controlled by the laws of the State where the transaction occurred. Yet, with respect to conflicting State views concerning Fourth Amendment and other rights, the law has been changing and the older rules are being replaced by more flexible rules such as the rule "significant relationship” with each of the States in question. The court went on to say that if the problem presented was considered from the procedural-substance viewpoint, that the evidence was properly admitted for two reasons, i.e., that evidentiary questions are generally governed by the laws of the forum and secondly, that if the conflict concerning the choice of law involves the preliminary issue of whether the evidence was wrongfully obtained, a substantive matter, then from the viewpoint of the "significant relationship” or "center of gravity” rule, the *1030 significant contacts in that case were with Illinois in that the crime was committed there, was being prosecuted there, defendant was a resident there, the great majority of witnesses were Illinois residents, that Indiana had no vital contact with the crime, and that the application of Illinois evidentiary law would not offend the comity of interstate relationships between Indiana and Illinois, and affirmed the conviction.
Thus, we see that the Illinois Supreme Court applied the modern conflict of laws rules applicable in the civil area to the criminal case before it.
We can also analogize, in the civil area, to New York cases on the subject. The trend in our State has also been to apply the law of the State which has the strongest interest in the resolution of the particular issue presented. Reference here to only several of the many New York cases on the subject should suffice.
One of the earlier and leading cases is Babcock v Jackson (12 NY2d 473) dealing with tort liability. In Babcock New York people went in a New York registered automobile for a weekend trip to Canada. An accident occurred in Ontario causing personal injuries to one of the New York passengers. Ontario forbade a suit by the passenger against the driver owner. In the New York suit, defendant moved to dismiss the complaint on the basis of Ontario law. Special Term granted the motion, and the Appellate Division affirmed.
The Court of Appeals reversed. Reviewing the history of this conflict of laws question, the court held that the substantive law to be applied would be that of the State which has the strongest interest in the resolution of the particular issue presented.
This approach has been referred to as the "interest analysis” approach.
In Farber v Smolack (20 NY2d 198) another negligence case, all parties were residents of New York. Defendant was the owner of the automobile loaned to the others for a trip to Florida. On the return trip, and in North Carolina, there was an accident as a result of which an action was brought in New York by the administrator of one of the deceased passengers killed in the accident and guardian of an infant injured therein as well as by another passenger. There was a difference between New York and North Carolina law with respect to the issue of liability of the owner. The North Carolina law required the jury to find that the use of the automobile was *1031 for the absentee owner’s benefit in order to impose liability. The court followed Babcock, also citing Macey v Rozbicki (18 NY2d 289) in applying New York law.
Also following the "interest analysis” approach with respect to a contract involving the Statute of Frauds is Intercontinental Planning v Daystrom (24 NY2d 372), in which the court said (pp 381-382):
"However, as we view this case, it is unnecessary to characterize the Statute of Frauds as either substantive or procedural since New York law should be applied in either event. If the statute be viewed as procedural, there is no problem since the law of the forum would be applied. Likewise, New York’s Statute of Frauds would be applied as the law of the State whose law governs generally if the statute be considered substantive since New York has the paramount interest in the application of its law in this case. (Cf. Matter of Crichton, 20 NY2d 124, 133; Matter of Clark, 21 NY2d 478, 486; cf. Miller v. Miller, 22 NY2d 12, 15-16.)”
See, also, Tooker v Lopez (24 NY2d 569), and automobile accident case in which both the majority and minority of the court used the "interest analysis” approach, but differed with respect to its application to the facts in that case, referring also to same as "grouping of contact” or "center of gravity” (p 590) and "contact theory or governmental interest theory” (p 596). The dissenting Justices felt that the law of the place of the accident should govern the conduct and qualifiedly the status of person, residents and nonresidents, within it, except in the extraordinary situation where the localization of persons and conduct is adventitious. They felt that under the particular facts of that case the greater contact and stronger interests were with the State in which the accident had occurred. It is interesting to note that Associate Justice Jasen, concurring in the dissent, had authored the opinion for the majority in Intercontinental Planning v Daystrom, (supra) handed down two weeks earlier.
A third line of cases refers to the deterrent effect on police conduct if an illegal search in a different jurisdiction were suppressed. Of course, we all understand that searches, arrests and confession made in violation of Fourth and Fifth (and Fourteenth) Amendment rights are to be suppressed wherever made. However, a forum court can make its own determination of constitutionality, subject to overriding Federal case guidelines. Where evidence is illegally obtained, in violation of *1032 local law, but not rising to constitutional proportions, the forum court can select the law to be applied, and consider, in addition to the preceding approaches of Burge (supra) and Saiken (supra) the deterrence approach.
In People v Orlosky (40 Cal App 3d 935), Indiana police received consent from defendant’s wife to search the marital residence in connection with a local Indiana crime. Upon such search the police found evidence of a California crime, and transmitted same to California authorities who initiated a prosecution there, the court holding such evidence admissible under California law despite its illegality under Indiana law. The court applied the "governmental interest” approach. It also examined the deterrent approach, the reason for the exclusionary rule, and found that police conduct in Indiana was not "dirty business”, and that the police conduct was proper under California law.
A New York case dealing with a confession made in California is People v Davis (55 AD2d 960). Although the conflicts of laws question was not discussed, the Second Department held, with citation of Federal and several New York cases, that a confession obtained from defendant upon his arrest in California violated his 6th Amendment right to counsel, and suppressed the same. The cases cited by the court, and relied upon by the court, did not involve conflict of laws questions. The Second Department evidently simply applied New York decisional law in determining whether the California confession should be suppressed.
Applying the foregoing principles to the case at bar, it is apparent that the State of New York has the greatest interest in this case, including the New Jersey searches, the Florida arrest, searches and confessions or admissions.
The alleged murder, kidnapping and robbery occurred in New York State, of a New York State citizen. The defendants were at least residents, if not domiciliary, of New York. Almost all witnesses in the New York prosecution are New York residents.
This court will not say that neither New Jersey nor Florida have any interests in this case, as undoubtedly those States do have an interest in police conduct towards transients or visitors within their respective territories. But such interests are minor when compared to the overwhelming New York interests in prosecution of such heinous crimes as here committed amongst its own residents on its own soil. Indeed, the *1033 police activity in New Jersey and Florida was mainly conducted by New York State Police officers with the assistance of police officers in said States and the use of facilities in said States in aid of the New York State police officers.
Further, the application of New York law in this instance would not offend the comity of interest relationship between New York and the other States involved.
Nor would the police conduct in New Jersey or Florida, if illegal (which this court does not find) require suppression as a deterrent.
Accordingly, this court will apply New York law with respect to the New Jersey and Florida transactions, subject only to overriding Federal law dealing with safeguarding Fourth and Fifth Amendment rights of these defendants. [Material omitted for purposes of publication.]
All motions to suppress physical evidence, the confession of Graham and the inculpatory statement of Lucas are denied.