STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. PAUL MI-
CHAEL CURRY, A/K/A MICHAEL CURRY AND ADOLF DON-
ALD EBERT, DEFENDANTS–RESPONDENTS, AND LOIS
SANDERS, DONALD SANDERS, JULIE LYNN VOLCHOK,
CHARLES CARR, LOUIS DALBERTH, PETER HEXTER, JOHN
KELTY, HAROLD DELUZIO, THEODORE WATLEY, THOMAS
CRAY, WILLIAM E. MATHIS, GEORGE QUIGLEY, AND THE
GUARANTEE BANCORP INC., T/A GUARANTEE BANK, DE-
FENDANTS.

Argued March 31, 1987—Decided October 15, 1987.

1

2

4

*Larry R. Etzweiler,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*Francis J. Hartman* argued the cause for respondent Adolf Donald Ebert (*Francis J. Hartman,* attorney; *Louis Williams,* on the brief).

*Thomas C. Brown* argued the cause for respondent Paul Michael Curry, a/k/a as Michael Curry.

The opinion of the Court was delivered by

O'HERN, J.

This appeal primarily concerns the admissibility, as evidence in a criminal trial, of the business records of a pyramid swindle

scheme. Lois and Donald Sanders were the masterminds of the scheme. They have pled guilty to criminal fraud and other misconduct. In related proceedings, on the State's appeal, we remanded their cases for resentencing. *State v. Sanders*, 107 *N.J.* 609 (1987). In furtherance of their scheme, the Sanderses recruited or used a variety of confederates, including some New Jersey State Police officers who were said to have provided security for the operation. These and others are among the defendants before us. Evidence was seized from Lois and Donald Sanders and certain confederates in Illinois. We granted the State's motion for leave to appeal the Appellate Division judgment that affirmed a trial court order suppressing any use of the evidence in New Jersey criminal proceedings. 105 *N.J.* 532 (1986).

In 1981 the scheme was operated under the name of Co–Op Investments and relieved some 2,000 New Jersey investors of over $1,000,000. *State v. Sanders, supra,* 107 *N.J.* at 613–14. As the scheme unfolded, it came to the attention of the New Jersey Bureau of Securities in the Attorney General's office. In fact, the Sanderses themselves initiated litigation to qualify their plan for governmental approval. On March 17, 1981, in the course of that litigation, the State noticed for production of many of the business records that are the subject of this proceeding. While that civil litigation was pending, the Sanderses absconded to California, then to Illinois.

They soon commenced to market the scheme to the citizens of Illinois. New Jersey law enforcement authorities were not far behind them. Before New Jersey could obtain the records by an interstate subpoena or other means, the Illinois authorities arrested the Sanderses and took possession of their records. The Sanderses were arrested on April 29, 1981, at a hotel meeting room in Peoria, Illinois, as they were in the process of conducting a meeting for new investors in their pyramid scheme. One defendant, Hexter, had testified before the New Jersey Bureau of Securities on April 28, 1981, a day before the arrest in Peoria. On the same day, another defendant, Cray,

testified to the Bureau that the Sanderses had mentioned going to Chicago with the computer records. Incident to the arrest, the Illinois authorities seized membership charts, cards, forms, computer printouts, cash, and other evidence of the conspiracy.

The morning following the arrest Illinois police obtained consent from Lois Sanders to search her hotel room. There they seized other items and the contents of a confederate's purse. The confederate then gave consent to search her car.

Based on their investigation, the Illinois authorities obtained a warrant on or about May 1, 1981, to search rooms and a safe deposit box registered to the Sanderses at a Hilton hotel in Skokie, Illinois. There they seized a computer and more print-outs, membership cards, cash receipts, notebooks and journals, as well as a gun and bullets.

For reasons not fully revealed because we do not have the official proceedings of the Illinois courts, the Illinois officers were found to have gained unlawful access to certain of the records in two respects: (1) the consent search was found not to have been voluntary, and (2) the search pursuant to the warrant was found to have been invalid because of insufficiency of the affidavits in support of the warrant.

The basic question that we now face is whether the actions of the Illinois authorities require that the evidence be quarantined to prevent further spread of any poisonous taint from their actions. We think not and reverse the judgments below that so held.

We must note at the outset that this is not a "silver platter" case. Cf. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (rejecting the "silver platter" doctrine that allowed the prosecutors of one sovereign to use the fruits of an illegal search conducted by another sovereign). There is no evidence that the Illinois authorities conspired in any way with the New Jersey authorities or turned this information over to the New Jersey authorities as a way of circumventing the Illinois court order or the requirements of Illinois law. Nor is

there any evidence that New Jersey authorities used Illinois officials to do any dirty work for them.

The lower courts seemed to focus on the procedural aspects of the debate rather than the substantive admissibility issues. We address the procedural issues first. Foremost are the problems of standing and choice of law.

## I

■■ The factual context of this case first requires analysis of application of choice-of-law considerations to the standing issue. Ruling from the bench on the defendants' motion to suppress, the trial court did not specifically address the relationship between standing and choice-of-law issues. It merely held that "if you are going to have a conspiracy for theft by deception and conspiracy for promoting gambling, they are all in it. [Defendants] all have standing." The State emphasizes that standing is a substantive matter, not merely a question of procedure, and should therefore be governed by Illinois law. It points to the recognition in *State v. Alston*, 88 *N.J.* 211, 218 n. 2 (1981), that the question of who may challenge a search and seizure is "within the purview of substantive Fourth Amendment law * * * " (citation omitted). However, labels of substance and procedure do not always resolve the underlying issues of choice of law. In resolving choice-of-law issues, New Jersey generally does not apply mechanical rules. Rather we have, at least in the civil context, "adopted the more flexible governmental-interest analysis in choice-of-law decisions." *Veazey v. Doremus*, 103 *N.J.* 244, 247 (1986). Because of the governmental interests involved in protecting the privacy of our citizens and the integrity of our judicial process, there are sufficient grounds to employ New Jersey standing rules.

■ While we have not patterned our standing doctrine on the same concepts of fourth-amendment jurisprudence adopted by the Supreme Court in *Rakas v. Illinois*, 439 *U.S.* 128, 99 *S.Ct.* 421, 58 *L.Ed.*2d 387 (1978), *reh'g denied*, 439 *U.S.* 1122, 99

*S.Ct.* 1035, 59 *L.Ed.*2d 83 (1979), and its progeny, we also have not adopted a rule of automatic standing, except in the case of a defendant charged with possession of the very item seized. Rather, we have asked whether the defendant has "a proprietary, possessory or participatory interest in either the place searched or the property seized." *State v. Alston, supra,* 88 *N.J.* at 228. The Court reasoned that its standard would be clearer and would produce more predictable results than the more "amorphous" federal standard of whether the party had "legitimate expectations of privacy in the area searched." *Ibid.* The Court explained that certainly the occupant of a car, although not having a property interest in the vehicle, could be permitted to object to an illegal search of the vehicle, especially when charged with possession of the contents seized, there an illegal firearm.

Whether in a particular case a defendant should be permitted to object to the use of illegally obtained evidence in a criminal trial will depend, then, on the particular factual circumstances in which the issue arises. In reality, the federal concept of a legitimate expectation of privacy cannot be divorced from its "nexus with the property searched or seized." *Id.* at 227. Without attempting to delineate the contours of the interest in the evidence seized that will justify standing, we are satisfied that the trial court was justified in finding standing in this case.

The question of standing was complicated by the tangled web of relationships among the defendants and the business entity. When the standing motion was heard, Lois and Donald Sanders were the lead parties in the motion to suppress. They were clearly persons having standing, either by virtue of the fact that they were charged with criminal possession of the seized evidence (gambling records) or because they had a proprietary interest in the places searched. For the sake of convenience the trial court permitted other defendants to intervene or participate in the Sanderses' motion to suppress. Each

of those other defendants had varying relationships with the goods seized.

Our courts generally have taken a liberal view of standing. *State v. Santana,* 215 *N.J.Super.* 63 (App.Div.1987). The Appellate Division in this case premised its view of standing on defendants' "participatory interest" in the goods seized by virtue of their role as conspirators. The phrase "proprietary, possessory or participatory interest" in relation to standing derives in New Jersey from its original expression in Maguire, *Evidence of Guilt* 216 (1959). *See State v. LaDuca,* 89 *N.J.Super.* 159, 163 (App.Div.1965); *State v. Wade,* 89 *N.J.Super.* 139, 155 (App.Div.1965); *State v. Bibbo,* 83 *N.J.Super.* 36, 38 (App. Div.1964).

■ Neither case nor commentary has catalogued the contents of the phrase. At a minimum, those charged *here* with conspiracy to promote gambling and theft by deception, such as Watley or Curry, have a "possessory interest" in the bulk of the items seized sufficient to have standing. Conspirators are treated as accomplices under *N.J.S.A.* 2C:2–6, and hence are guilty of the same substantive offense as the principal. In addition, Count Three of the indictment specifically charged them with "maintenance of * * * equipment for [gambling]."[1] The State Police officers charged with conspiracy to promote gambling would be in the same category. Insofar as the State Police officers were charged with official misconduct, the evidence offered against them probably would be offered as part of the proof of those substantive offenses.

All of these issues were highly speculative at the time the motion was heard. Some of the evidence may prove to be inadmissible against the officers. When the suppression motion was argued, the trial court had reserved decision on motions to sever their cases. For the trial court to have sorted

---

[1]We note that at oral argument the State asserted that excluding Watley, the other defendants were not charged with possessory offenses. The procedural posture of the case does not disclose the status of the Count Three charges.

out the different aspects of standing would have required a trial within the case to resolve the relationship of the evidence to every substantive offense with which each defendant was charged. As the nexus between the property and the individual defendants becomeș so attenuated as to eliminate standing, such evidence may also become irrelevant or inadmissible. In the posture of this case, then, we shall not disturb the trial court's resolution of the issue of standing.

## II

But resolving the question of standing does not resolve the substantive question of what law should govern the validity of the search and the application of the exclusionary rule.

There are many subtle and as yet fully unresolved questions in applying conflict-of-law principles to the evolving body of differing state law on the validity of searches. *See* 1 W. LaFave, *Search and Seizure* § 1.5(c), at 110 (2d ed. 1987); Corr, "Criminal Procedure and Conflict of Laws," 73 *Geo. L.J.* 1217 (1985); Theis, "Choice of Law and the Administration of the Exclusionary Rule in Criminal Cases," 44 *Tenn.L.Rev.* 1043 (1977); and Tullis & Ludlow, "Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule," 10 *U.S.F.L.Rev.* 67 (1975). These commentators all point to the differing policies involved in exclusionary rule choice-of-law questions. Is the search to·be considered legal if it violates the foreign state's law but not the forum's, or is the question whether policy choices call for exclusion of the evidence in the forum? *See People v. Rogers,* 74 *Cal.App.*3d 242, 141 *Cal. Rptr.* 412, 416 (Ct.App.1977), *vacated o.g.,* 21 *Cal.*3d 542, 146 *Cal.Rptr.* 732, 579 *P.*2d 1048 (1978); *People v. Saiken,* 49 *Ill.*2d 504, 275 *N.E.*2d 381 (1971) (using the "center of gravity" or "most significant relationship" test of conflict jurisprudence), *cert. den.,* 405 *U.S.* 1066, 92 *S.Ct.* 1499, 31 *L.Ed.*2d 796 (1972); *People v. Benson,* 88 *A.D.*2d 229, 231, 454 *N.Y.S.*2d 155, 157 (1982); *People v. Graham,* 90 *Misc.*2d 1019, 1029, 396 *N.Y.S.*2d 966, 972 (Co.Ct.1977) (all applying "governmental interests"

analysis); *Burge v. State*, 443 *S.W.*2d 720 (Tex.Crim.App.) (holding exclusionary rule is an evidentiary matter as to which forum law controls), *cert. den.*, 396 *U.S.* 934, 90 *S.Ct.* 277, 24 *L.Ed.*2d 233 (1969). Under the "governmental interests" analysis the purposes of the exclusionary rule are to be considered:

> [T]he exclusionary rule has a two-fold purpose: to deter illegal police conduct and to relieve the courts from being compelled to participate in illegal conduct. Neither goal would be served by exclusion of the evidence * * * since [foreign] authorities would not (and indeed, should not) be deterred from engaging in conduct which is legal in their state, and admission of the evidence in [the forum state] would not mean placing the judicial imprimatur on lawlessness. [*Pooley v. State*, 705 *P.*2d 1293, 1303 (Alaska Ct.App.1985).]

Thus, under *Pooley* when foreign state authorities have been found to act in accordance with both federal standards and that state's law, no policy of the exclusionary rule is served by applying the higher standard of the forum jurisdiction. *But see People v. Superior Ct.*, 33 *Cal.App.*3d 523, 109 *Cal.Rptr.* 143 (1973) (refusing to admit evidence seized in illegal federal search in order to preserve the integrity of state judiciary).

Our courts have grappled with these issues as well. *State v. Mollica*, 217 *N.J.Super.* 95 (App.Div.), *certif. granted*, 108 *N.J.* 214 (1987), addressed the question of what policy choices should be made in admitting evidence seized by federal officials in violation of a state constitutional provision. *In re Mahler*, 177 *N.J.Super.* 337 (App.Div.), *certif. den.*, 87 *N.J.* 349 (1981), dealt primarily with the standing in New Jersey of Pennsylvania parties to suppress, under *Rule* 3:5–7(a), evidence seized in New Jersey that might incriminate the parties in Pennsylvania. The court was confident that in any Pennsylvania proceeding "the fundamental criteria of the Fourth Amendment will be observed." 177 *N.J.Super.* at 350–51. *State v. Konzelman*, 204 *N.J.Super.* 389 (Law.Div.1985) dealt with a New Jersey officer's inadvertent violation of New York statutory law governing blood sample requests and concluded that the officer's "conduct was constitutionally reasonable." *Id.* at 394.

Here the State argues that (1) the New Jersey exclusionary rules should not apply because the deterrent purposes of the fourth-amendment exclusionary rule have been satisfied by the

Illinois suppression order, and hence there is no need to suppress the evidence in New Jersey, and (2) in any event, under New Jersey law the consent and warrant searches would have been valid.[2]

■ Addressing the second point first, we agree that an independent analysis by the forum state is appropriate to determine which law governs the validity of the search. In the analogous context of federal use of state-acquired evidence, the Supreme Court has held that

[i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed. [*Elkins v. United States, supra,* 364 *U.S.* at 223–244, 80 *S.Ct.* at 1447–48, 4 *L.Ed.*2d at 1681.]

However, an independent inquiry does not resolve the more difficult question of what to do once the independent inquiry is concluded.

As noted, whether the forum state should have no interest in further restricting the use of evidence suppressed in the state

---

[2]In passing, we note the question not raised but perhaps relevant, whether because Illinois has not disavowed the "good faith" exception to the warrant requirement carved out in *United States v. Leon,* 468 *U.S.* 897, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984) and its companion case, *Massachusetts v. Sheppard,* 468 *U.S.* 981, 104 *S.Ct.* 3424, 82 *L.Ed.*2d 737 (1984), the search should be treated as valid under Illinois law. The record is inadequate to resolve whether, under *Massachusetts v. Sheppard* or *United States v. Leon,* a reasonably well-trained police officer would have been able to rely on the magistrate's warrant, notwithstanding the affidavits. As noted, we simply have no record of the basis on which the Illinois court suppressed the evidence. The Law Division concluded that the four corners of the warrant papers did not sustain a search because in part the recital of a "pyramid scheme" would not necessarily equate with criminal activity. We are not sure that a well-trained officer would have reached the same conclusion. The issue is not clarified by the reasoning offered by defendant Watley:

You know, I have been hearing this name Pyramid game being called gambling. I have been in the gaming business for 17 years and I can assure you, Madam [Prosecutor] that Pyramid game cannot be assumed as being gambling * * *.

in which it was seized depends on an evaluation of the interests and policies involved. However, in this case, the record does not clearly establish the predicate for such policy choices. When it suppressed the evidence here, the trial court was focusing primarily on the concerns of Donald and Lois Sanders whose privacy interests were so closely implicated by the Illinois search. The trial court appears to have resolved the validity of the Illinois warrant search on the basis of fourth-amendment constitutional principles and to have accepted the Illinois consent search ruling as constitutionally correct. No independent principles of Illinois law were noted as resolving that issue.

Our disposition does not require us to evaluate the policy goals that would be served by suppressing the evidence regarding the other defendants because we find the evidence independently admissible against them.

## III

The ultimate question before us is whether the specific evidence proffered here is admissible against the remaining defendants. Subject to verification of the actual contents of the containers of material delivered to New Jersey authorities by Illinois officials, the materials at issue appear to be similar to the business records that were viewed in *In re Guarino*, 104 *N.J.* 218 (1986), as not demonstrating a privacy interest sufficient to bar the State from compelling their production. As such, the materials in this case were always subject to legal process and, indeed, their production was or could have been compelled in the pending civil litigation or by the State grand jury investigating the matter. They were thus the subject of an independent discovery action by the State of New Jersey prior to their seizure by Illinois authorities. We see no policy reason why that event and the fortuity of mistakes by the Illinois authorities should somehow redound to the defendants' benefit. Such has never been the law.

14

In announcing what later became known as the "fruit of the poisonous tree" doctrine, Mr. Justice Holmes qualified its prohibition by stating:

Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed. [*Silverthorne Lumber Co. v. United States*, 251 *U.S.* 385, 392, 40 *S.Ct.* 182, 183, 64 *L.Ed.* 319, 321 (1920).]

 Thus, the key question is whether the State *learned of* the evidence from an untainted source, not whether it gained possession of the evidence from one. In *Silverthorne*, the Government sought to cure its gross violation of the defendant's constitutional rights by subpoenaing his business records after they were returned to defendant pursuant to a suppression order. The Court held the subpoena need not be honored because issuance was too directly connected with the earlier illegal search and seizure. *Id.* at 391–92, 40 *S.Ct.* at 182–83, 64 *L.Ed.*2d at 321; *see* Wasserstrom and Mertens, "The Exclusionary Rule on the Scaffold: But Was it a Fair Trial?", 22 *Am.Crim.L.Rev.* 85, 137 (1984).

Later in *Nardone v. United States*, 308 *U.S.* 338, 341, 60 *S.Ct.* 266, 268, 84 *L.Ed.* 307, 311–12 (1939), the Court explained that the business conversation intercepted in that case, like the business papers seized in *Silverthorne*, could not escape suppression since, by definition, there was no independent source for the acquisition. However,

[w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, *Evidence of Guilt*, 221 (1959). [*Wong Sun v. United States*, 371 *U.S.* 471, 487–88, 83 *S.Ct.* 407, 417–18, 9 *L.Ed.*2d 441, 455 (1963).]

"The independent source rule [thus] allows admission of evidence that has been discovered by means *wholly independent* of any constitutional violation[.]" *State v. Sugar*, 100 *N.J.* 214,

237 (1985) (quoting *Nix v. Williams*, 467 *U.S.* 431, 443, 104
*S.Ct.* 2501, 2508, 81 *L.Ed.*2d 377, 387 (1984) (emphasis added)).

In *Nix v. Williams, supra,* the United States Supreme Court
expanded the independent source exception to include not only
evidence derived by means of a wholly independent source but
also evidence that inevitably would have been discovered from a
wholly independent source. It reasoned:

> [The rationale of the exclusionary rule is that] the prosecution is not to be put
> in a better position than it would have been in if no illegality had transpired.
>
> By contrast, the derivative evidence analysis ensures that the prosecution is
> not put in a *worse* position simply because of some earlier police error or
> misconduct. * * * The independent source doctrine teaches us that the interest
> of society in deterring unlawful police conduct and the public interest in having
> juries receive all probative evidence of a crime are properly balanced by putting
> the police in the same, not a *worse,* position than they would have been in if no
> police error or misconduct had occurred. [*Nix v. Williams, supra,* 467 *U.S.* at
> 443, 104 *S.Ct.* at 2509, 81 *L.Ed.*2d at 387 (footnote omitted).]

We are satisfied that these principles call for the admission
into evidence in this case of any of the materials that were the
subject of the State's original notice to produce for discovery on
March 17, 1981, and any of the materials that were the subject
of the request for interstate subpoena for evidence delivered to
the Illinois authorities in December 1982. (The items listed
appear to track the March 17, 1981, notice.) It is not contradict-
ed that a New Jersey State grand jury learned that Lois and
Donald Sanders had fled to Illinois and had taken materials
from Co–Op Investments with them. The trial court seemed to
accept the factual predicate that the evidence had been obtained
independently but seemed unwilling to accept the doctrine. In
its first ruling, the court stated:

> It seems to me if material is illegally seized, you cannot use it. You cannot
> use it in Illinois, and you cannot use it in New Jersey by calling it something
> that could have been subpoenaed.

And on rehearing, the court again said:

> Now, to say to me that because New Jersey acted appropriately, you know,
> when they made their demand, * * *, and that, therefore I should overlook the
> actions of * * * Illinois, * * * and permit it to be used. I really don't think
> that's right.

The trial court seemed to focus its reasoning on the doctrine of
"inevitable discovery," then recently announced in *State v.*

*Sugar, supra,* 100 *N.J.* 214. It ruled that the doctrine "has more to do with something like a knife or a body * * *. I really don't feel that that is a basis for me to reverse myself, and I'll deny the motion."

But this is not an "inevitable discovery" case. The New Jersey authorities are not contending that they inevitably would have discovered this evidence. They had already discovered it and had indeed requested it. The Notice to Produce for March 17, 1981, contains a specific list of items sought, explicitly including: any computer printouts or lists of investors, persons who were to receive a return as well, or anyone who had received a promised $35,000 payout; the scripts employed by the Sanderses in promoting the scheme; any charts or graphs showing which investors were to receive the returns; cash account books and banking records; and any agreements with charitable organizations.

 This is not to say that there may not be particular items among those seized by the Illinois authorities that do not fall into the category of business records that would have been subject to the discovery by the State in the ordinary course of its proceedings. Confidential memos between the parties or internal memos dictated after the investigation was commenced might be examples of evidence that was not subject to legal process. These can be sorted out in any supplementary proceedings before the trial court. That the defendants did not have the opportunity to destroy the materials because of the actions of the Illinois authorities is speculative and not dispositive. *Segura v. United States,* 468 *U.S.* 796, 816, 104 *S.Ct.* 3380, 3391, 82 *L.Ed.*2d 599, 616 (1984) (in applying the independent source exception to the exclusionary rule, court should not consider mere possibility that defendants could have destroyed the evidence in question had it not been found earlier).

We find that as described to us, the materials obtained by the New Jersey law enforcement authorities from the Illinois authorities primarily constitute the business records of this enter-

prise; that as such, they have but a limited privacy value and that the State has amply demonstrated the independent source of its knowledge of the existence of these records. As noted, there may be certain records that partake of a high degree of confidentiality and therefore are privileged. The defendants are free to seek to identify any particular records that would fall into this category.

In sum, we conclude the evidence demonstrates clearly and convincingly that the bulk of these records should be admitted into evidence under the independent source exception to the exclusionary rule. We are satisfied that the admissibility of this evidence does not prejudice any constitutional rights of these individual defendants. The premise of the independent source doctrine is not that deterrence is unnecessary but that a constitutional violation has not occurred. Hence, the State is not taking advantage of constitutional violations. *See State v. Novembrino*, 105 *N.J.* 95 (1987).

For the reasons stated, the judgment of the Appellate Division is reversed. The cause is remanded to the trial court for further proceedings in accordance with this opinion.

WILENTZ, C.J., and HANDLER, POLLOCK, GARIBALDI and STEIN, JJ., join in this opinion.

CLIFFORD, J., concurs in the result.

*For reversal and remandment*—Chief Justice·WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.