**UNITED STATES of America**

v.

**Khary JONES**

No. 02–10323–RGS.

United States District Court, D. Massachusetts.

May 14, 2003.

Kim West, United States Attorney's Office, Boston, MA, for U.S. Attorneys.

Mark W. Shea, Shea, Larocque & Wood LLP, Cambridge, MA, for Khary Jones (1), Defendant.

*FINDINGS OF FACT AND RULINGS OF LAW ON DEFENDANT'S MOTION TO SUPPRESS*

STEARNS, District Judge.

*FINDINGS OF FACT*[1]

Before first light on a cold and rainy March 19, 2002, Boston police officers Christopher Broderick and Richard Moriarty, while patrolling the South End in an unmarked car, espied two hooded men sprinting down Appleton Street in apparent pursuit of a nepenthian pedestrian. The officers, who had been briefed on a spate of recent robberies, ordered the men to stop. Khary Jones complied by throwing his hands in the air. His companion, Samuel Whiteside, stayed on the chase, with officer Broderick in pursuit. Whiteside ducked between two cars, paused at a lamp post, and then fell in with the pedestrian, eventually identified as one Dennis Weaver. When Broderick caught up with Whiteside, he asked him what he was doing. Whiteside replied that he was "just walking with my boy," alluding to Weaver. Broderick saw that Whiteside was wearing a single white latex glove. Broderick ordered both men back to the patrol car.

Meanwhile, as Moriarty approached Jones, he noticed that he was wearing a pair white latex surgical gloves.[2] Jones explained that it was cold and that these were the only gloves that he could find. When Moriarty asked Jones if he was carrying a weapon, Jones admitted to possessing a knife, which Moriarty confiscated.

Weaver disavowed knowing either Whiteside or Jones and was allowed to go on his way. Leaving Broderick to stand guard, Moriarty retraced Whiteside's ramble. On the top of a trash bag next to the lamp post where Whiteside had paused, Moriarty found a .32 caliber semi-automatic handgun and a one dollar bill, both of which, despite being exposed to the elements, were dry to the touch. A live round was chambered in the gun. When neither Whiteside nor Jones could produce a firearms license, they were placed under

---

1. The findings are based on the evidence offered at the suppression hearing and the uncontested facts set out in the pleadings. Officer Moriarty, who is currently on reserve duty, was for that reason unavailable as a witness.

2. Moriarty knew from experience that latex gloves were often worn by criminals to avoid leaving fingerprints.

arrest. *See* M.G.L. c. 140, § 129C (any person found in a public place with a firearm "shall on demand of a police officer . . . exhibit his license to carry firearms"). During the subsequent booking, a set of keys was taken from Jones and placed in a personal property bag.

On March 18, 2002, at approximately 12:15 a.m., Thomas Edwards left his Dodge Neon with the engine running in front of a convenience store on Washington Street in Dorchester. Two female passengers, Toni Harrison and Romana Powell, remained in the rear passenger seat. A young black male, described by the women as having braided hair, approached the car, pointed a handgun, and ordered the women out. The young man then commandeered the Neon and drove off in the direction of Codman Square. Edwards reported the incident to Boston police.

Boston detective Paul MacIsaac was assigned to investigate the Edwards carjacking. On March 23, 2001, Toni Harrison was brought to the Area C–11 station. Based on the description she had given of the carjacker, a computer selected seventy-eight police images of young black men with braided hair. Harrison could not identify any of the seventy-eight images. On a hunch, MacIsaac asked the computer to search out young men matching Harrison's description but with an Afro-style haircut. The request generated ninety-one new photos. As the eightieth photo appeared, Harrison began crying, and said, "I think that's him." When MacIsaac asked how sure she was, Harrison replied, "Eighty-five percent." As MacIsaac attempted to retrieve the identity of the person pictured, the computer froze.[3] Two days later, MacIsaac was able to resurrect the ninety-one images. Number eighty, the image identified by Harrison, proved to be that of the defendant Khary Jones. MacIsaac noticed that the photo was four years old, a factor which he thought might have influenced Harrison's reluctance to make a fully positive identification. MacIsaac began searching police files for a more recent photo. The quest led him to the booking sheet and photo that had been generated by the March 19, 2002 arrest. MacIsaac assembled an array of nine photos, including the more recent photo of Jones.[4] When the array was shown to Harrison, she immediately picked out Jones' photo. Ramona Powell also positively identified Jones. Edwards, who had only glimpsed the robber, tentatively chose the photo of someone else.[5]

On April 3, 2002, police recovered the Dodge Neon from a parking space on Tremont Street, two blocks from where Jones had been arrested. Accumulated parking tickets showed that the car had not been moved since March 19. A duplicate key to the Neon was provided by Edwards' mother who told police that the original had been secured on a ring with other of her son's keys. When MacIsaac searched the car, he did not find the stolen keys. Recalling the notation of a key ring on the inventory section of Jones' booking sheet, MacIsaac obtained a search warrant. The key ring was then retrieved from the personal property bag being held (with Jones) at the Nashua Street Jail. A silver key on the ring, stamped with the word "Neon," started Edwards' car.

---

3. The picture remained frozen on the screen in Harrison's presence. She made no further comment and left the viewing room some two minutes later.

4. Having examined the array, I find it fair to a commendable degree. Every subject pictured bears a remarkable resemblance in age, complexion, facial shape, and hair style.

5. All three witnesses, like Jones, are black.

## DISCUSSION

Jones seeks to suppress the gun, the Dodge Neon key, and the identifications made by Harrison and Powell. His suppression argument is premised on the "fruits of the poisonous tree" doctrine of *Wong Sun v. United States*, 371 U.S. 471, 481–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Under *Wong Sun*, evidence that is seized as the result of police exploitation of a constitutional illegality will be suppressed. The "primary illegality" to which Jones alludes is his seizure and arrest by officers Broderick and Moriarty. More particularly, Jones argues that the officers did not have "a particularized and objective basis" for suspecting criminal activity at the moment he was stopped. *United States v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Because, as Jones views it, his stop and arrest were illegal, "that illegality taints the subsequent search and seizure of his [sic] property." Defendant's Memorandum, at 9. According to Jones, but for the illegal stop, police would not have recovered the gun and the key, and ultimately, would not have obtained the identifications from Harrison and Powell.[6]

█ A combination of suggestive circumstances, largely innocent in and of themselves, when considered in their totality, may constitute the reasonable suspicion necessary to justify a *Terry* stop. *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). This is especially so when these circumstances are filtered through the collective eyes of experienced officers. *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750–751, 151 L.Ed.2d 740 (2002). One might reasonably think that the sight of two men, with hoods pulled over their heads, running down a crime-infested city street at 4:30 a.m., in apparent pursuit of an unsuspecting pedestrian, would provoke a police reaction.[7] Courts have found reasonable suspicion on less. *See Commonwealth v. Matthews*, 355 Mass. 378, 381, 244 N.E.2d 908 (1969) ("We are of opinion that it was reasonable for the officer to stop and briefly interrogate a man who, while carrying a bag with a department store label, was walking at two fifty in the morning in an area where there had recently been several incidents of breaking and entering."); *Commonwealth v. Wascom*, 236 Pa.Super. 157, 344 A.2d 630, 632 (1975) (officer acted reasonably in stopping two men carrying unwrapped merchandise in a deserted business area at 12:30 a.m.).

█ Assume nonetheless that the stop was illegal.[8] Would it make a difference? *Wong Sun*, contrary to Jones' argument, does not posit a "but for" test. *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). While the case holds that evidence that is "come at by exploitation of [an earlier] illegality" must be suppressed, the rule is different when that same evidence is shown to have been obtained "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407. "The exclusionary rule prohibits introduction into evidence of tangible

---

6. Jones was seized as a matter of law when he signaled submission to Moriarty's command to stop by raising his hands. *California v. Hodari D.*, 499 U.S. 621, 626–627, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The government does not contest the fact of a seizure.

7. The latex gloves both men were wearing, which are not the usual cold weather wear, might be seen as clinching that suspicion, as the government argues. The officers did not, however, realize that the gloves were made of latex until after the stop was effected.

8. I assume so only for argument's sake. In my view, the officers had the reasonable necessary to justify a stop.

materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536–537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (citations omitted). In other words, evidence that is unlawfully seized does not "automatically become 'sacred and inaccessible.'" *Nix v. Williams*, 467 U.S. 431, 441, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

The attenuation doctrine is not an exception to the exclusionary rule, but a test of the suitability of its application. When intervening events make it impossible to say that evidence was obtained solely as the result of an earlier Fourth Amendment violation, a "fruit of the poisonous tree" analysis has no relevance. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In more colloquial language, when the fruit is no longer joined to the tree, it is free for the plucking.

■ The Supreme Court has identified three factors for determining when the causal chain has been sufficiently attenuated to dissipate any taint: (1) the time elapsed between the illegality and the acquisition of the challenged evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

■ Take the discarded gun. The voluntary abandonment of property by a fleeing suspect is the type of intervening event that makes its seizure by police, with or without a warrant, "simply not unreasonable." *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir.1972). *See also Hodari D.*, 499 U.S. at 629, 111 S.Ct. 1547; *United States v. Brown*, 663 F.2d 229, 230 (D.C.Cir.1981). The same analysis applies to the keys. These were taken from Jones for safekeeping incident to his incarceration, and not for any investigative purpose. *Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). *Cf. Whren v. United States*, 517 U.S. 806, 811, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The keys sat undisturbed in a property locker for two weeks, until MacIsaac obtained a warrant for their seizure. "The valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the [prior illegality]." *Segura v. United States*, 468 U.S. 796, 814, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). *Cf. United States v. Green*, 111 F.3d 515, 521–522 (7th Cir.1997) (the discovery of a lawful arrest warrant was an intervening event sufficient to dissipate the taint of a prior illegal stop). Finally, MacIsaac can hardly be accused of exploiting a prior illegality of which he was unaware.[9]

---

9. The independent source doctrine provides a separate basis for the lawful seizure of the keys. MacIsaac, working apart from Moriarty and Broderick, and unaware of the circumstances of Jones' arrest, gleaned the potential significance of the keys from the facts developed during his own independent investigation. No information obtained as a result of Jones' arrest was used to secure the warrant.

*Segura*, 468 U.S. at 814, 104 S.Ct. 3380. The fact that the keys were already in the possession of the government is not an impediment to their second seizure. The "reseizure of tangible evidence already seized is no more impossible than rediscovery of intangible evidence already discovered," provided that the "later, lawful seizure is genuinely independent of [the] earlier, tainted one." *Murray,*

**46**

■ With respect to the Harrison and Powell identifications, Jones stands on no firmer ground. The admissibility of identification testimony which is alleged to be the fruit of a Fourth Amendment violation is typically determined by the independent source test of *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), rather than by the attenuation test. "In the typical 'fruit of the poisonous tree' case ... the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation, and the question before the court is whether the chain of causation has become so attenuated ... as to remove the 'taint.' ... Thus most cases begin with the premise that the challenged evidence is in some sense the product of illegal government activity." *Id.* at 471, 100 S.Ct. 1244. In-court identification, on the other hand, normally rests on an independent source antedating the alleged illegality, that is, the witness's independent recollection of the commission of the offense. *Id.* Moreover, "[i]n an in-court identification, the defendant is present in the courtroom in accordance with a legal process. Thus, there is no need to ask whether the defendant is present in the courtroom as the direct result of a violation of the Fourth Amendment." *People v. Lewis*, 975 P.2d 160, 171–172 (Colo.1999) (*en banc*). If the witness's recollection is found neither to have resulted from nor to have been influenced by unlawful after-the-fact police conduct, the

in-court identification is admissible. *Crews*, 445 U.S. at 472–473, 100 S.Ct. 1244.

■ Here, the most that can be said is that the freezing of Jones' image on the computer for the two minutes while Harrison remained in the viewing room might have served to fix Jones' image in her memory. The flaw in this argument, however, lies in the fact that the computer glitch occurred only *after* Harrison had rejected 157 earlier photos, and only *after* Harrison had made her initial identification of Jones. Moreover, her subsequent (and 100 percent positive) identification of Jones was made from a much more recent photo depicting an older Jones with a changed hairstyle.

■ While Jones hypothesizes that the circumstances under which Harrison (and Powell) selected him from the array might have been suggestive, absent any showing of constitutional necessity, a defendant has no due process right to a pretrial evidentiary determination of the admissibility of identification testimony. *Watkins v. Sowders*, 449 U.S. 341, 349, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981).[10] Under the circumstances of this case, defendant's rights will be fully protected by cross-examination at trial and the familiar burden-shifting rules of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).[11]

487 U.S. at 542, 108 S.Ct. 2529. *See also State v. Joyce*, 243 Conn. 282, 705 A.2d 181, 188 (1997). "[T]he key question is whether the State *learned* of the evidence from an untainted source, not whether it gained possession of the evidence from one." *State v. Curry*, 109 N.J. 1, 532 A.2d 721, 727 (1987). "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one ... there is no reason why the independent source doctrine should not apply." *Murray*, 487 U.S. at 542, 108 S.Ct. 2529.

10. The government represents, and no reasons have been offered suggesting the contrary, that for both women the trauma of the carjacking would be compounded if they were forced to confront the alleged offender twice.

11. Defendant may also be entitled to a voir dire examination at trial outside the presence of the jury should circumstances warrant.

## ORDER

For the foregoing reasons, the motion to suppress the gun and the Dodge Neon key is *DENIED*. The motion to suppress the identifications of Harrison and Powell is also *DENIED* without prejudice to Jones' right to fully develop at trial the totality of the circumstances under which their identifications were made. The motion for a further pretrial evidentiary hearing on the issue of the identifications made by Harrison and Powell is *DENIED*.

SO ORDERED.